[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-10399
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cv-23460-KMW

DOROTHY JACKSON,

Plaintiff-Appellant-
Cross Appellee,

versus

NCL AMERICA, LLC,

Defendant-Appellee-
Cross Appellant,

PRIDE OF AMERICA SHIP HOLDING, LLC,

Defendant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(April 10, 2018)

Before ED CARNES, Chief Judge, WILSON, and JORDAN, Circuit Judges.

PER CURIAM:

While on a cruise ship, Dorothy Jackson slipped on an onion peel and fell. She brought several claims under maritime law against Norwegian Cruise Line America. After a bench trial, the district court ruled in her favor on one claim and in Norwegian's favor on the others. Jackson appeals, and Norwegian cross-appeals.

I.

Jackson was a utility hand on a Norwegian cruise ship. On November 16, 2012, a day before Jackson's five-month contract ended, she and a coworker, Erroll Davis, were walking along one of the ship's corridors to get food at the crew mess. Although passengers could access the corridor, they did not have access to it on the day of the incident. As Jackson was walking and writing down her address to give to Davis, she slipped on an onion peel on the ground near the ship's garbage disposal area. Neither Jackson nor Davis saw the onion peel before Jackson slipped and fell. Davis picked up the onion peel, which he said "looked fresh," and threw it away. Jackson went to the ship's infirmary and reported pain in her right shoulder, lower back, and right hip. As scheduled, she disembarked the vessel the following day to return to her home in New Orleans, Louisiana.

2

Less than a week later, a Norwegian employee emailed Jackson to coordinate her return to work in late January.  After Jackson told him that she needed to see a doctor before she could return, he directed her to contact an employee from Norwegian's medical department, which Jackson failed to do.  Jackson hired an attorney who advised her to see a local physician, which she did.  Over a month later Jackson hired a new attorney, and he advised her to see a different physician, Dr. James Butler.  Norwegian advised Jackson's attorney[1] on multiple occasions that:  "[W]e have arranged for your client to see a number of highly qualified physicians.  If your client instead elects to see other physicians at your urging or otherwise, [Norwegian] will reimburse at its usual costs for such treatment that is medically necessary, to the point of maximum medical cure."

From 2013 to 2016, Jackson had two right knee surgeries, a left knee surgery, a right shoulder surgery, and a back surgery.  All of the surgeries were performed by a physician chosen by Jackson (Dr. Butler), who was not within Norwegian's network.  Norwegian reimbursed Jackson at its network rate for the three knee surgeries and the shoulder surgery, as well as her office visits and physical therapy.  It refused to reimburse her for the back surgery.  Norwegian explained that Jackson had failed to disclose during her application process her

---

[1] Unless otherwise noted, all references to Jackson's "attorney" are to the second attorney.

3

previous back pain.  Norwegian argued that the back surgery was related to that undisclosed condition, and as a result, it was not obligated to pay for it.

Jackson sued Norwegian, asserting claims of Jones Act negligence, unseaworthiness, maintenance, and cure.  After a bench trial, the district court entered judgment in favor of Jackson on the cure claim, although it limited her recovery to the rate that Norwegian would have paid for her back surgery had a physician in its network performed the surgery.  It ruled in favor of Norwegian on the remaining three claims.  This is Jackson's appeal and Norwegian's cross-appeal.[2]

---

[2] With a few exceptions not applicable here, we can review only final judgments of district courts.  See 28 U.S.C. § 1291.  The parties filed their notices of appeal after the district court issued its "Final Judgment" but before it issued its order denying Jackson's postjudgment motion for prejudgment interest.  Because the district court has resolved that postjudgment motion, its "Final Judgment" is now final enough to give us jurisdiction to review it.  Federal Rule of Appellate Procedure 4(a)(4)(B)(i) provides that:

> If a party files a notice of appeal after the court announces or enters a judgment — but before it disposes of any motion listed in Rule 4(a)(4)(A) — the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

Among the motions listed in Rule 4(a)(4)(A) is a motion "to alter or amend the judgment under Rule 59" of the Federal Rules of Civil Procedure.  Fed. R. App. P. 4(a)(4)(A)(iv).  "[A] postjudgment motion for discretionary prejudgment interest is a Rule 59(e) motion."  Osterneck v. Ernst & Whinney, 489 U.S. 169, 177, 109 S. Ct. 987, 992 (1989).  As a result, the parties' notices of appeal became effective when the district court issued its order disposing of Jackson's postjudgment motion for prejudgment interest, Fed. R. App. P. 4(a)(4)(B)(i); see Stansell v. Revolutionary Armed Forces of Colom., 771 F.3d 713, 745–46 (11th Cir. 2014) ("[A] notice of appeal filed during the pendency of a Rule 59 motion is simply suspended."); Narey v. Dean, 32 F.3d 1521, 1524 (11th Cir. 1994) ("[U]nder [Federal Rule of Appellate Procedure] 4(a)(4) . . . , an otherwise timely notice of appeal filed before the disposition of a Rule 59 motion is not voided but instead merely lies dormant while the motion is pending, and the notice of appeal becomes effective as of the date of the order disposing of the Rule 59 motion.").  We have jurisdiction over this appeal.

## II.

"After a bench trial, we review the district court's conclusions of law <u>de novo</u> and the district court's factual findings for clear error." <u>Proudfoot Consulting Co. v. Gordon</u>, 576 F.3d 1223, 1230 (11th Cir. 2009). "A finding of fact is clearly erroneous when the entirety of the evidence leads the reviewing court to a definite and firm conviction that a mistake has been committed." <u>Dresdner Bank AG v. M/V Olympia Voyager</u>, 446 F.3d 1377, 1380 (11th Cir. 2006).

## III.

### A.

Jackson first contends that the district court erred by ruling that she failed to present sufficient evidence on her negligence claim. To succeed on her negligence claim, Jackson had to prove that Norwegian had actual or constructive notice of the purported dangerous condition, that is, the onion peel on the ground. <u>Keefe v. Bahama Cruise Line, Inc.</u>, 867 F.2d 1318, 1322 (11th Cir. 1989). Jackson argues that the district court erred in ruling that she failed to present sufficient evidence of Norwegian's notice of the dangerous condition. She asserts that the onion peel must have been dropped by a fellow crewmember, and because the crewmember created the dangerous condition, Norwegian had actual notice of it.

Even if, as Jackson claims, a crewmember dropped the onion peel and created the dangerous condition, that does not establish that Norwegian had notice

5

of it.  Norwegian must have had "actual or constructive notice of the risk-creating condition."  See Everett v. Carnival Cruise Lines, 912 F.2d 1355, 1358 (11th Cir. 1990) (quoting Keefe, 867 F.2d at 1322).  We have rejected the position that notice can be imputed to a shipowner merely because the shipowner created the dangerous condition, reasoning that such a rule would obviate Keefe's requirement that the shipowner have notice of the risk-creating condition.[3]  See id. at 1359.

Jackson presented no evidence of Norwegian's actual notice of the onion peel and instead relied on the testimony that neither she nor Davis dropped the onion peel, and that the ship's passengers did not have access to the area where Jackson fell.  That circumstantial evidence, without more, does not provide sufficient evidence that Norwegian knew about the dangerous condition.  Because Jackson failed to provide sufficient evidence that Norwegian had actual notice of the dangerous condition, and because she concedes that "concepts of constructive notice have no place in this case," the district court did not err in concluding that Jackson failed to present sufficient evidence of Norwegian's negligence.[4]

---

[3] In this Court's Sorrels decision we applied a standard like the one Jackson proposes, see Sorrels v. NCL (Bahamas) Ltd., 796 F.3d 1275, 1287 (11th Cir. 2015), but we did so because the defendant did not "take issue with [the] standard," and we explicitly did not "pass[ ] on its correctness."  Id.

[4] Jackson contends in the alternative that she need not prove notice because Norwegian's negligence "arose from the negligent act of a fellow crewmember in dropping the onion peel on the floor of the vessel in an area exclusively used by the crew."  She fails to cite any binding precedent from this circuit applying or accepting such a rule.  In any event, she failed to present sufficient evidence that a fellow crewmember negligently dropped the onion.

6

B.

Norwegian contends that the district court erred by ruling in favor of Jackson on her cure claim because, it argues, it should have prevailed on its affirmative defense under McCorpen v. Cent. Gulf Steamship Corp., 396 F.2d 547 (5th Cir. 1968). Jackson argues that the district court got it right on her cure claim, except that it erred by limiting her recovery for medical expenses to Norwegian's network rates.

1.

To establish a McCorpen defense, Norwegian had to show that (1) Jackson intentionally misrepresented or concealed medical facts; (2) the non-disclosed facts were material to its decision to hire her; and (3) a connection exists between the withheld information and the injury complained of in this lawsuit. Brown v. Parker Drilling Offshore Corp., 410 F.3d 166, 171 (5th Cir. 2005) (citing McCorpen, 396 F.2d at 548–49). Norwegian contends that, although the district court correctly found that it satisfied the first two elements of the McCorpen defense, the court erred in ruling that Norwegian failed to meet the third element — the "connection" element — by applying that element too rigidly. Norwegian cites the Fifth Circuit's Brown decision and asserts that it "need only show that the prior and present injuries affect the same location on the body." Because

7

Jackson's injuries "affect the same body part," Norwegian insists that "the requisite connection is established."

We disagree. In the Brown decision, the evidence showed that the plaintiff failed to tell his employer that he had previously suffered a lumbar strain with possible disc herniation at the L4-L5 and L5-S1 spinal segments. Id. at 176. At trial the plaintiff's expert witness acknowledged that the "prior back strains were to the same lumbar-spine region as [the plantiff's] current back problem." Id. (emphasis added). In discussing the third element of the McCorpen defense, the court cited several decisions where a causal link was established because the preexisting injuries were in the "exact" same area as the injuries complained of in the lawsuit. Id. at 176–77. The court also cited two decisions where a causal link was not established. See id. at 177 n.9. In one of them, the employer failed to show "that the claimant in fact suffered from a preexisting condition or disability. [The employer] merely showed that the claimant complained of back pain on a prior occasion." Id. (quotation marks omitted). In the other one, the employer failed to show "that the claimant's preexisting disability was identical or similar, and there was no evidence of a previous similar diagnosis." Id. (quotation marks omitted). The Brown court found those two cases distinguishable and held that, because the plaintiff's "injuries were to the same location of the lumbar spine, the causal link between the concealed information and the new injury was

8

established."  Id.; see also Meche v. Doucet, 777 F.3d 237, 249 (5th Cir. 2015) (holding that the "connection" element was satisfied where the plaintiff "aggravated his pre-existing lumbar illness").

The record shows that as early as 2008 Jackson had seen doctors concerning pain in her lower back.  The notes from her December 2008 doctor's visit indicate that an X-ray of Jackson's lumbar spine "show[ed] some evidence of degenerative disk disease at L2-L3 and L3-L4."  After she fell in September 2012, Jackson sought treatment for the back injury she suffered from the fall.  An MRI report from May 2013 noted disc bulges at L2-L3 and L3-L4.  But notably that report also indicated disk herniation at L4-L5 and L5-S1, and Jackson's December 2015 hospital records show that she was diagnosed with and underwent surgery for lumbar disk herniation at L4-L5 and L5-S1.

Given that evidence, along with the expert testimony about Jackson's medical conditions and surgeries, the district court did not clearly err in finding that "there is no compelling evidence of a connection between Jackson's pre-2012 back pain, which all agree w[as] recurrent and degenerative in nature, and the hernia[ted disks] for which Dr. Butler performed surgery."  Although the two injuries do not have to be identical, Brown, 410 F.3d at 176, simply showing that Jackson's previous pain and her injury from the fall affect the same body part without more specificity does not suffice, see id. at 176–77.  Because Norwegian

9

failed to show a connection between Jackson's degenerative disk issues at L2-L3 and L3-L4 and her disk herniation at L4-L5 and L5-S1, the district court did not err in concluding that Norwegian failed to satisfy the third element of the McCorpen defense.  As a result, it did not err in ruling in favor of Jackson on her cure claim.

2.

Jackson contends that the district court erred in limiting her recovery on her cure claim to Norwegian's network rates.  Maritime law provides that "if a seaman . . . seeks his own private physician rather than another chosen by the employer he forfeits only that amount of compensation, if any, that would have been saved if he had received the necessary care from the employer's doctor . . . ."  Caulfield v. AC & D Marine, Inc., 633 F.2d 1129, 1134 (5th Cir. 1981).[5]  Jackson argues that because "there is no evidence that [she] or her attorney were ever advised of [Norwegian's] recommended physician," the district court "committed a clear error of fact" in concluding that she sought "private medical care in lieu of or instead of some care offered by" Norwegian.  That is not correct.

The evidence shows that on November 24, 2012, in response to an email from an employee of Norwegian's personnel department, Jackson informed Norwegian for the first time that she was still hurting from her fall and needed

---

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

medical care.  That employee directed her to contact an employee from Norwegian's medical department, but Jackson never did.  Instead, she hired an attorney (the first attorney) who told her to go to a doctor at a local clinic.  She did and that doctor cleared her to go back to work.  She then hired a new attorney who advised her to see Dr. Butler, a physician at a different clinic.  The new attorney also directed her not to speak with anyone from Norwegian.

The evidence also shows that on December 4, 2012 the cruise ship sent Jackson's medical records to a Norwegian crew claims manager.  On December 13, the claims manager emailed an employee from Health Systems International, a company that "worked with [Norwegian] to help provide and arrange medical care for crew members," to schedule an appointment for Jackson and to advise the company that Jackson had retained an attorney.  At trial Norwegian's representative testified that the employee from Health Systems International arranged an appointment for Jackson with an orthopedic surgeon, Dr. Shackleton. And a January 4, 2013 email from a Health Systems International employee to the Norwegian crew claims manager reflects that the employee had tried for "weeks" to contact Jackson about her appointment but was unable to reach her.

On January 18, 2013, Jackson's attorney instructed Norwegian "not to correspond directly with Ms. Jackson any further, and that the law firm would be taking on the scheduling and coordination of her medical care, and they would be

11

forwarding information to the company." Norwegian's representative testified that it responded to the attorney's letter and informed him that "if Ms. Jackson elected to treat with her own doctors we would reimburse those costs, and that we would do so up to our network rate."[6] He also stated that he "believe[d] Ms. Jackson never attended her appointment with Dr. Shackleton" because "she had obtained counsel who advised [Norwegian that counsel] would make the arrangements for [her] medical care."

The upshot is that Jackson, following the advice of her attorneys, chose not to speak with Norwegian and instead to seek treatment with her own private physicians. She did that despite the fact that Norwegian told her attorney that "if she picked a doctor more expensive than the doctors that Norwegian selected for her, . . . she would be responsible for the difference in that pay." Based on the evidence in the record, we are not left with a definite and firm conviction that the district court made a mistake in determining that Jackson sought private medical care instead of medical care offered by Norwegian. See Dresdner Bank, 446 F.3d at 1380.

**AFFIRMED.**

---

[6] That Jackson or her attorneys did not know the name of the doctor in Norwegian's network is of no moment. Health Systems International attempted to contact Jackson for weeks to inform her of her appointment with Dr. Shackleton, and Norwegian repeatedly advised Jackson's attorney that Norwegian had its own in-network doctors and was willing to offer "any further assistance [it] could provide."

12