**Devon ARCHER, Plaintiff-Appellee, Cross-Appellant,**

v.

**TRANS/AMERICAN SERVICES, LTD., Defendant-Appellant, Cross-Appellee.**

No. 86–5789.

United States Court of Appeals, Eleventh Circuit.

Jan. 7, 1988.

David J. Horr, Mitchell, Harris, Horr & Associates, P.A., Miami, Fla., for defendant-appellant, cross-appellee.

Elizabeth K. Clarke, Daniels & Hicks, P.A., Miami, Fla., for plaintiff-appellee, cross-appellant.

Before FAY and HATCHETT, Circuit Judges, and HODGES *, Chief District Judge.

HATCHETT, Circuit Judge:

We are called upon to determine whether the district court properly ruled that a person was a seaman "in the service of the ship" at the time the person suffered an injury on shore entitling the person to maintenance and cure as well as wages. Finding the district court's ruling proper, we affirm.

## FACTS

Trans/American Services, Ltd. (Trans/American) is a catering concessionaire that provides food and beverage service, with attendant personnel, to cruise ships. It had a contract with Scandinavian World Cruises (Bahamas), Ltd., (Scandinavian) the owner and operator of the M/V Scandinavian Sun. In February, 1982, Trans/American's recruiting agent in Jamaica hired Devon Archer, the appellee. Archer worked as an assistant pantryman and lived aboard the vessel until January, 1984, except for brief vacations.

In April, 1983, Archer signed his second contract of employment with Trans/American for a one-year term beginning May 11, 1983, and expiring May 11, 1984. In January, 1984, the need for maintenance and repairs required that the M/V Scandinavian Sun be placed in dry dock for two weeks. Although Archer's contract term had not expired, he was required to vacate the ship during dry docking, but was invited to sign a new contract of employment for a one-year term beginning January 23, 1984. Archer signed the new contract and then left on a two-week unpaid vacation to Jamaica, his homeland.

Although the ship was not scheduled to depart until January 23, 1984, the new em-

* Hon. William Terrell Hodges, Chief U.S. District Judge for the Middle District of Florida, sitting  by designation.

ployment contract required that Archer report to Trans/American's offices in Miami on January 21, 1984.[1] On January 21, 1984, as required, Archer returned from Jamaica and upon reporting in at the Trans/American office, company officials instructed Archer to report to the ship on January 23, 1984. As to the instructions, the district court found: "They informed him that in the interim he would have no specifically assigned duties and he was free to do as he pleased until the time of departure." The following day, Archer was injured while a passenger in a friend's automobile on a personal pleasure trip.

Archer filed a three-count complaint against Trans/American and Scandinavian for recovery under the Jones Act, recovery of maintenance and cure under the general maritime law, and recovery of punitive damages and attorney's fees. Because the essential facts pertaining to Archer's claims were not in dispute, the parties submitted cross-motions for summary judgment. The district court granted Archer's motion for summary judgment and awarded him general damages, but denied his requests for attorney's fees and punitive damages. Trans/American Services appeals the award.

## ISSUES

Trans/American presents four issues in this appeal: (1) whether Trans/American was acting as an agent for the vessel; (2) whether Archer was "in the service of the ship" while awaiting its departure; (3) whether he is entitled to maintenance and cure; and (4) whether he is entitled to wages for the one-year period during which he was recovering from his injuries.[2]

1. The contract, in pertinent part, provided:
   Unless notified otherwise, you will be expected to arrive at our office at 1700 North America Way, Fifth Floor, Dodge Island on January 21, 1984 a.m. This does not mean a week earlier or a date later than specified. If you fail to arrive on this date, U.S. Immigration is required to refuse your admittance. If you arrive after office hours please proceed to El Plaza Hotel, 100 N.E. 10th Street, Miami, Flor-

## DISCUSSION

### A. Factual Findings—Standard of Review

As in all civil cases, the district court's findings of fact in admiralty cases are binding unless clearly erroneous. Fed.R.Civ.P. 52(a), 28 U.S.C.; *Hercules Carriers, Inc. v. Claimant State of Florida, Dept. of Transportation,* 768 F.2d 1558 (11th Cir. 1985); *Fisher v. Agios Nicolaoas V,* 628 F.2d 308 (5th Cir.1980).

■ Trans/American suggests that its burden of demonstrating clear error is relaxed because the parties submitted this action to the district court entirely on depositions and other documentary evidence. Where the evidence consists entirely of documentary evidence and depositions and does not require any assessment of credibility, the reviewing court is in as good a position as the district court to decide the facts. *Emmco Insurance Co. v. Wallenius Caribbean Lines, S.A.,* 492 F.2d 508, 512 (5th Cir.1974). Trans/American asserts that its burden under Fed.R.Civ.P. 52(a) to show that the district court's findings of fact are clearly erroneous is not as heavy as it would be if the evidence presented at trial had required the court to make credibility choices. Even under a relaxed burden, however, we may reverse only if we find the factual findings clearly erroneous. Since no factual disputes were presented to the district court, our task as to the factual findings is easy.

### 1. Agency

In granting Archer's motion for summary judgment, the district court found that under the land based contract between Trans/American and Scandinavian, Trans/American was acting as an agent for the ship and the ship owner/operator when Archer checked in at

ida. Show them this employment letter and they will allow you to register. Report to the office listed above January 21, 1984 a.m.

2. We agree with the appellee that another way of viewing this case is simply whether Archer is entitled to maintenance and cure because he was in the service of the ship at the time of the accident. Nevertheless, we address the case upon the issues as presented by the appellant.

Trans/American's Miami office on January 21, 1984. Trans/American challenges this finding as clearly erroneous, alleging that no agency relationship existed between Trans/American and Scandinavian.

■ Federal maritime law embraces the principles of agency. *Naviera Neptuno S.A. v. All International Freight Forwarders, Inc.*, 709 F.2d 663 (11th Cir.1983). In *Naviera,* we held the existence of an agency relationship is a question of fact. 709 F.2d at 665. On the basis of the undisputed averments of both parties, the district court's finding that an agency relationship existed is not clearly erroneous.

■ Trans/American claims that it is merely an independent contractor operating pursuant to a contractual agreement with the shipowner. It denies any agency relationship with the vessel or the vessel's owner. If, however, the vessel is to provide food for its passengers, it must have employees to prepare and serve the food. If the vessel does not hire directly persons to perform these functions, then some other person or entity must act on behalf of the vessel to obtain the personnel to carry out this important cruise ship function. The entity which acts on behalf of the vessel is the vessel's agent. In this case, an agency relationship exists between Trans/American and Scandinavian. Trans/American's independent contractor status does not render the agency finding clearly erroneous or improper as a matter of law.

If the law were to recognize this contractual arrangement as something other than an agency relationship, the result would be anomalous. In this case, a cruise ship has contracted for its entire food and beverage service, thus, completely insulating itself from any and all liability which might arise from that service. If the ship owner or operator can contract for its food and beverage service, then it may also contract for its crew members, its engineers, its maintenance, housekeeping, and hospitality staffs. The logical extension of this notion is that the ship owner or operator could contract for its entire operation. In such a manner, the ship owner or operator would escape all accountability for the ship's condition and the conduct of those working aboard. In every instance in which the ship owner or operator has historically been held accountable, an independent contractor allegedly unrelated to the ship would be the responsible party.

### 2. Archer's Status

■ The district court also found that Archer attained seaman status at the time he checked in at Trans/American's Miami office and was "in the service of the ship." Trans/American contends that this finding is clearly erroneous, arguing that Archer was on leave until January 23, 1984, that he had signed off the ship's articles before going on leave, and that he had not yet signed back on the ship's articles when he was injured.

We conclude that Archer was "in the service of the ship." We arrive at this conclusion by recognizing that Trans/American was acting as the ship's agent in hiring the personnel to handle the food and beverage concession. In order to efficiently provide its services, Trans/American had to marshal its personnel prior to the ship's departure date. Consequently, Trans/American required Archer to check in at the Miami office on January 21, 1984, to commence his employment which resulted in his assignment to ship board duty on January 23, 1984. Archer's compliance, therefore, was in the "course of his employment" and inured to Trans/American's benefit. *See Vincent v. Harvey Well Service,* 441 F.2d 146 (5th Cir.1971).

Trans/American argues that Archer's scheduled leave of absence was not to end until January 23, 1984, when the ship was scheduled to depart from Miami. It is important to recognize, however, that Archer's leave of absence was effectively terminated by the requirement that he make an appearance in Miami prior to that date. Furthermore, the new employment contract stated that Immigration officials had been instructed by Trans/American to refuse Archer admittance if he failed to arrive on January 21, 1984. It was necessary, there-

fore, that Archer return from Jamaica two days before the scheduled departure of the M/V Scandinavian Sun not only to secure his employment, but also to ensure his entry into this country. Finally, the fact that Archer was not performing duties aboard the ship for Trans/American at the time of injury does not deprive him of seaman status. *Braen v. Pfeifer Oil Transp. Co.,* 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 919 (1959); *Magnolia Towing Co. v. Pace,* 378 F.2d 12 (5th Cir.1967). Because Trans/American made Archer's return to Miami a prerequisite to commencing work aboard ship, we find that the district court correctly concluded that Archer had seaman status when he was injured.

### B. Legal Conclusions—Standard of Review

The district court's conclusions of law are subject to plenary review. *Bailey v. Carnival Cruise Lines, Inc.,* 774 F.2d 1577 (11th Cir.1985). As pointed out earlier, with no factual disputes before it, the district court reached legal conclusions based on agreed facts.

#### 1. Maintenance and Cure

Maritime law has historically recognized a seaman's right to maintenance and cure for injuries suffered in the course of his service to the vessel, whether occurring on sea or on land. *O'Donnell v. Great Lakes Dredge & Dock Co.,* 318 U.S. 36, 63 S.Ct. 488, 491, 87 L.Ed. 596 (1943). In *O'Donnell,* the Supreme Court explained that the maritime benefit of maintenance and cure must be regarded as "an incident to the status of the seaman in the employment of a ship." 63 S.Ct. at 492.

Trans/American further contends that Archer's case is not analogous to a "shore leave" case within the parameters defined by the progeny of *Aguilar v. Standard Oil Co.,* 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943). We have established that Archer attained seaman status when he checked in at the Miami office of Trans/American on January 21, 1984, and was in the service of the ship at the time of his injury.

■ The law provides that blue water seamen may recover for injuries suffered during shore leave while on personal business. *Liner v. J.B. Talley and Co., Inc.,* 618 F.2d 327 (5th Cir.1980). Archer was a blue water seaman. He lived aboard the M/V Scandinavian Sun from February, 1982, until the time of his accident, except during a few brief vacations over that two-year period. Had he not been injured, he would have boarded the M/V Scandinavian Sun on January 23, 1984, and again resided on the ship for the duration of his twelve-month employment contract. Archer was essentially a blue water seaman on shore leave. He was neither at his home in Jamaica, nor on the ship where he resides. The purpose for his presence in Miami on the date of the accident was solely to serve Trans/American's interest in marshaling personnel to meet its contractual obligation. Once he arrived in Miami and signed in with Trans/American's office, he was a member of the ship's crew. The two-day wait in Miami was the equivalent of shore leave in a foreign port. We conclude that, as a blue water seaman, Archer was in the same position during his two days in Miami as he would have been had he been on leave in some other port during a cruise.

#### 2. Wages

■ Trans/American contends that the district court erred in awarding Archer lost wages for his one-year contract period. It presents the alternative arguments: (1) that Archer was entitled to no wages at all for the same reasons Trans/American presented in its argument against Archer's entitlement to maintenance and cure; or (2) that Archer is only entitled to recover his wages for a one-month period.

As for Archer's entitlement to an award of wages, it is settled law that wages is a basic component of an award of maintenance and cure. *See Vickers v. Tumey,* 290 F.2d 426 (5th Cir.1961). Because we conclude that Archer, as a blue water seaman in a foreign port, is entitled to maintenance and cure under governing principles

of maritime law, he is also entitled to his wages.

With regard to the appropriate time period for calculating an award of wages, the law is also clear in this circuit. A seaman under contract for a year can collect a year's lost wages as part of maintenance. *Nichols v. Barwick*, 792 F.2d 1520, 1524 (11th Cir.1986). We concur with the law of our predecessor circuit. In *Vickers v. Tumey*, 290 F.2d 426, 434 (5th Cir.1961), the Fifth Circuit stated: "If employment is for a period other than the voyage, such as coastwise articles for six months or for a definite time, the end of the voyage concept does not apply and wages are due him for the period of employment." Archer's employment contract with Trans/American was for the one-year period from January 23, 1984, to January 23, 1985. He is entitled not only to maintenance and cure, but also to his lost wages for the full term of his contract.

Accordingly, the district court's judgment is affirmed.

AFFIRMED.

HODGES, Chief District Judge, dissenting:

I respectfully dissent. The Court's conclusion that Trans/American was an agent and not an independent contractor of the ship owner embraces a theory that was not

urged upon the District Court; is not necessary to a decision in the case; [1] and tends to obliterate the law of the Circuit—indeed, the law everywhere—governing the jurisprudential analysis which should be made in differentiating agents and employees from independent contractors.[2]

I must also disagree with the Court's ultimate result. "From its dawn, the maritime law has recognized the seaman's right to maintenance and cure for injuries suffered in the course of his service to his vessel, whether occurring on sea or on land." *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 41–2, 63 S.Ct. 488, 491, 87 L.Ed. 596 (1943). Here, beyond any question, Archer was a seaman in the service of the vessel at all times he was aboard ship regardless of the identity of his employer. As noted by the majority at the outset of the Court's opinion, therefore, the ultimate question in the case is simply whether or not Archer was "in the service of the ship" at the time of his accident and resulting injury. The Court concludes that he was, relying by analogy upon *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943), and its progeny establishing the right of a blue water seaman[3] to maintenance and cure while on "shore leave" for personal recuperation. Although the issue is both novel and diffi-

---

1. It is the seaman's relationship to the vessel, not the identity of his employer, that generates his right to maintenance and cure. The Appellee himself correctly states that: "The fact of an agency relationship between the entities is ... irrelevant to the case. It is the seaman's employer who is liable for maintenance and cure, and not the shipowner where the two are not the same. *Mahramas v. American Expert Isbrandtsen Lines, Inc.*, 475 F.2d 165 (2d Cir.1973) (cruise ship concessionaire owed maintenance and cure to its employee who worked aboard ship, not shipowner)." Appellee's brief, p. 13.

2. See, e.g., *Pitts v. Shell Oil Company*, 463 F.2d 331 (5th Cir.1972); *Marvel v. United States*, 719 F.2d 1507 (10th Cir.1983); *Trustees of Sabine Area Carpenters' Health & Welfare Fund v. Don Lightfoot Home Builder, Inc.*, 704 F.2d 822 (5th Cir.1983); *Newcomb v. North East Insurance Company*, 721 F.2d 1016 (5th Cir.1983); *Stone v. Pinkerton Farms, Inc.*, 741 F.2d 941 (7th Cir. 1984); *Building Material and Dump Truck Driv-*

ers, etc. v. National Labor Relations Board, 669 F.2d 759 (D.C.Cir.1981), all discussing in a variety of legal settings the numerous factors to be considered in deciding agent/independent contractor issues.

3. The term "blue water seaman" refers to members of the crew who live aboard the ship and serves to differentiate them from seamen who live ashore. The difference is legally important because a blue water seaman is entitled to recover for an injury suffered during shore leave while on personal business; but a land-based seaman who has a shoreside injury must prove a causal connection between the injury and the performance of his duties. *Liner v. J.B. Talley and Co., Inc.*, 618 F.2d 327, 332 (5th Cir.1980). It follows that other cases involving land-based seamen who are injured in automobile accidents (such as *Daughdrill v. Diamond M. Drilling Company*, 447 F.2d 781 (5th Cir.) *cert. denied* 405 U.S. 997, 92 S.Ct. 1261, 31 L.Ed.2d 466 (1971)), do not help in resolving this case.

cult, I do not believe that the "shore leave" analogy is appropriate in this case.

In January, 1984, the M/S Scandinavian Sun was taken out of service for its annual dry docking during the period January 9 through January 23. Archer signed off the ship's articles [4] and left the vessel at its home port in Miami. However, his then existing employment contract with Trans/American had not expired; and, before departing Miami for his home in Jamaica, he entered into a new agreement providing for a raise in pay (from $450.00 to $600.00 per month) effective January 23, 1984. He then travelled to Jamaica for what became, in effect, an unpaid two week vacation between voyages. To be sure, as emphasized by the majority, his contract required that he return to Miami and check in with Trans/American on January 21; but he was not paid and was not due to rejoin the ship until it returned to service on January 23. Indeed, it is significant that his contract of employment did not identify any specific ship by name; and, although the parties clearly contemplated that Archer would return to the M/S Scandinavian Sun, it is equally clear that Trans/American had the legal right under the employment contract as of the time of Archer's accident on January 22 to assign (or reassign) him to any other ship it pleased.[5]

In my view, therefore, it cannot fairly be said on these facts that Archer was on "shore leave" at any time between January 9 and January 23. The vessel was not on a voyage calling in a distant or foreign port; it was between voyages and was due to reenter service in its home port. Archer had signed off the ship and never signed back on. Indeed, he could have been assigned prior to January 23 to work on an entirely different vessel. He may well have been an employee of Trans/American for some purposes during that crucial period given his contract of employment and the requirement that he check in on January 21, but he was not in the service of the ship.

---

**4.** Though not directly employed by the ship owner, it is undisputed that when food and beverage personnel sign on the ship and commence their service to the vessel they become members of the crew and subservient to the authority of the vessel's officers.

**5.** In his brief Archer states that he "... was a blue water seaman whose only home for the year to come was to be the M/V Scandinavian Sun *or such other ship as Defendant might assign him to*" (Appellee's Brief, p. 16, emphasis supplied).