[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-12341

_____

D.C. Docket No. 1:13-cv-23697-MGC

BRENT WOLF,

Plaintiff - Appellant,

versus

CELEBRITY CRUISES, INC.,
d.b.a. Celebrity Cruises,
THE ORIGINAL CANOPY TOUR,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 28, 2017)

Before JORDAN, ROSENBAUM, and SILER,[*] Circuit Judges.

PER CURIAM:

Brent Wolf sued OCT Enterprises, Ltd., doing business as The Original Canopy Tour, and Celebrity Cruises, Inc. after being injured during an offshore zip-lining excursion. He appeals two district court orders—one dismissing the claims against OCT for lack of personal jurisdiction, and the other granting summary judgment in favor of Celebrity. After a thorough review of the parties' briefs, the record, and with the benefit of oral argument, we affirm both orders.

**I**

In October of 2012, Mr. Wolf, his wife, Patricia Cannon, and a friend of theirs, Beverly Falor, set sail as passengers aboard the Celebrity *Infinity*. Ms. Cannon purchased cruise tickets for herself and Mr. Wolf through a travel agent. Mr. Wolf received a cruise ticket contract which stated that "providers, owners[,] and operators" of shore excursions and tours "are independent operators and are not acting as [Celebrity's] agents or representatives." D.E. 65-1 at 2.

Mr. Wolf and Ms. Falor purchased tickets at the shore excursion desk onboard the *Infinity* to participate in a zip-lining activity on a private nature reserve in Costa Rica on October 15, 2012. Those tickets stated again that providers of shore excursions and tours "are independent contractors and are not acting as

---

[*] The Honorable Eugene Siler, United States Circuit Judge for the Sixth Circuit, sitting by designation.

[Celebrity's] agents or representatives." D.E. 65-4. Mr. Wolf signed a liability waiver provided by OCT, which stated that the zip-line excursion was owned and operated by OCT. *See* D.E. 65-5.

The zip-lining tour consisted of ten observation platforms and nine horizontal traverses. On one of the traverses, Mr. Wolf failed to stop or otherwise slow down near the end of the zip-line and slammed into a platform. He suffered severe injuries, including an avulsion of his calf muscle on his left leg. Mr. Wolf asserts that he had spun backwards during the traverse and could not see the platform as he approached it. He maintains that he was unaware of how to turn himself around because OCT personnel had not instructed him on how to do so. He also claims that he was unable to slow down because the leather gloves provided by OCT were not thick enough, and that a bumper was missing from the landing platform he crashed into.

In his complaint, Mr. Wolf asserted negligence claims against OCT and claims against Celebrity under theories of direct and vicarious liability. He alleged that Celebrity was negligent in failing to warn him of a dangerous condition and negligent in hiring and retaining OCT. He also claimed that Celebrity was liable for OCT's alleged negligence under theories of actual agency, apparent agency, and joint venture. He further asserted that he was the intended beneficiary of the contract between Celebrity and OCT, and that Celebrity had breached its

3

contractual duties to him. Following a hearing, the district court dismissed OCT from the lawsuit for lack of personal jurisdiction. The district court then granted summary judgment in favor of Celebrity on all of Mr. Wolf's remaining claims.

## II

We review *de novo* the district court's dismissal of OCT for lack of personal jurisdiction. *See Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006). A plaintiff has the burden of establishing a *prima facie* case of jurisdiction over a non-resident defendant, meaning he must present enough evidence to withstand a motion for directed verdict. *See Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268–69 (11th Cir. 2002). "Where, as here, the defendant submits affidavits to the contrary, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction unless those affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Id.* at 1269 (citations omitted). "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Id.* (citations omitted).

"A federal district court sitting in diversity may exercise personal jurisdiction to the extent authorized by the law of the state in which it sits and to the extent allowed under the Constitution." *Id.* (citations omitted). "A defendant

4

can be subject to personal jurisdiction under Florida's long-arm statute in two ways: first, [Fla. Stat. §] 48.193(1)(a) lists acts that subject a defendant to *specific* personal jurisdiction—that is, jurisdiction over suits that arise out of or relate to a defendant's contacts with Florida," and, second, "[Fla. Stat. §] 48.193(2) provides that Florida courts may exercise *general* personal jurisdiction—that is, jurisdiction over any claims against a defendant, whether or not they involve the defendant's activities in Florida—if the defendant engages in 'substantial and not isolated activity in Florida.'" *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1203– 04 (11th Cir. 2015) (emphasis in original).

Mr. Wolf asserted that OCT is subject to personal jurisdiction under both the general and specific jurisdiction provisions of the Florida long-arm statute, or, alternatively, under Federal Rule of Civil Procedure 4(k)(2). The complaint alleged that the similarly named The Original Canopy Tour-USA, L.L.C.—a company with the same officers as OCT and whose website referenced OCT, and vice-versa—is listed with the Florida Department of State with a principal place of business in Miami, Florida; that OCT is carrying out business and/or business ventures in Florida; that OCT marketed its shore excursions through Celebrity for sale to passengers boarding its ships in Fort Lauderdale; and that OCT entered into contracts in Miami with Celebrity and other carriers, in which it consented to personal jurisdiction and venue in the Southern District of Florida and agreed to

5

indemnify Celebrity. Mr. Wolf noted that he was not in possession of the contract between OCT and Celebrity and therefore could not attach a copy of it to his complaint.

OCT moved to dismiss Mr. Wolf's complaint for improper venue and lack of personal jurisdiction and to quash service of process. In support, OCT attached the declaration of Richard Graham, a shareholder and vice-president of OCT. According to Mr. Graham, The Original Canopy Tour-USA, L.L.C. is an entirely independent and separate entity; OCT never owned or used the P.O. box mailing address in Miami, Florida identified on the website, www.canopytour.com, which is operated by an independent travel agency; and OCT never maintained any place of business in Florida or a branch office in Florida or the United States. Mr. Graham stated that OCT shareholders pay for a service at a mail holding/forwarding facility in Miami to avoid unreliable mail service in Costa Rica. He acknowledged that OCT listed the facility's Miami address in its Tour Operator Agreement with Celebrity and in other contracts with other cruise lines, but maintained that OCT communicates almost exclusively by email and has received almost no mail at the Miami facility, nor has it ever conducted business or maintained employees or personnel there.

Mr. Wolf attached several documents to his response, including the Tour Operator Agreement, listing OCT as a limited liability company with offices in

Miami, Florida; The Original Canopy Tour-USA, L.L.C.'s Florida Department of State registration, articles of incorporation, and 2011 annual report; and a screenshot from www.canopytour.com, listing a P.O. box in Miami.

The district court held a non-evidentiary hearing on OCT's motion to dismiss. After hearing from the parties, it granted the motion.

## A

We begin with general jurisdiction. Under Florida's long-arm statute, "[a] defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, instrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity." Fla. Stat. § 48.193(2). "The reach of this provision extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment" and, therefore, to determine general jurisdiction, "we need only determine whether the district court's exercise of jurisdiction over [OCT] would exceed constitutional bounds." *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir. 2010).

"A court may assert general jurisdiction over foreign . . . corporations . . . when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the foreign State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). "[O]nly a limited set of

7

affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there'"—indeed, "[t]he paradigm all-purpose forums for general jurisdiction are a corporation's place of incorporation and principal place of business." *Daimler AG v. Bauman*, 134 S. Ct. 746, 760, 761 n.19 (2014). Only in the "exceptional case" may "a corporation's operations in a forum other than its formal place of incorporation or principal place of business . . . be so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 761 n.19.

Mr. Wolf's jurisdictional allegations and evidentiary submissions are substantially similar to those we concluded were insufficient in *Carmouche*. In that case, we held that a shore excursion operator's connections with Florida—including a Florida bank account, two Florida addresses (one of which was a P.O. box), purchasing insurance from Florida companies, filing a financing statement with the Florida Secretary of State, joining a non-profit trade organization based in Florida, and consenting to jurisdiction in the Southern District of Florida for all lawsuits arising out of its agreements with a cruise line—were not so "continuous and systematic as to render it essentially at home there." 789 F.3d at 1204 (internal quotation marks and alterations omitted). Similarly, in *Fraser*, we concluded that a foreign tour operator's aggregate contacts, including a website accessible from Florida, advertisements in publications with circulation in the United States, the

8

procurement of insurance through an agent in Florida, the purchase of about half of its boats in Florida, and employee trainings and promotions in Florida, did not confer general jurisdiction in Florida. *See* 594 F.3d at 847.

To the extent Mr. Wolf asserts that the Miami address listed on the Tour Operator Agreement would establish general jurisdiction, OCT sufficiently rebutted this contention through Mr. Graham's declaration. Mr. Graham explained that this address is merely a mail-forwarding facility used because of the unreliable mail system in Costa Rica. In response, Mr. Wolf attached a number of documents, including the Tour Operator Agreement itself. These documents, however, do not conflict with or rebut Mr. Graham's statements.

Mr. Wolf requested jurisdictional discovery in order to adequately rebut the evidence presented by OCT. The right to jurisdictional discovery is a qualified one, available "when a court's jurisdiction is genuinely in dispute." *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 730 (11th Cir. 1982). Such discovery requests should not serve as fishing expeditions, and, as such, are appropriate only when "a party demonstrates that it can supplement its jurisdictional allegations through discovery." *Trintec Indus., Inc. v. Pedre Promotional Prod., Inc.*, 395 F.3d 1275, 1283 (Fed. Cir. 2005). Mr. Wolf's general request for jurisdictional discovery— made over four months after filing his complaint and buried within his response to OCT's motion to dismiss—did not specify what information he sought or how that

9

information would bolster his allegations. The district court therefore did not improperly deny jurisdictional discovery. *Compare United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1280–81 (11th Cir. 2009) (affirming district court's dismissal for lack of personal jurisdiction before discovery was taken where plaintiff never formally moved for jurisdictional discovery but included the request as a proposed alternative in response to a motion to dismiss, did not serve notices for depositions, and did not take formal action to compel discovery), and *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 (11th Cir. 1999) (affirming district court's denial of jurisdictional discovery when no efforts had been made in the eight months between the filing of the complaint and the time it was dismissed, plaintiffs' only allusion to discovery was on the first page of their response to the motion to dismiss, and plaintiffs "failed to specify what they thought could or should be discovered"), *with Eaton*, 692 F.2d at 730–31 (reversing district court's dismissal for lack of personal jurisdiction as premature where plaintiff had served subpoenas *duces tecum* identifying specific materials to support the allegations, but plaintiff had not yet received the discovery).[1]

**B**

---

[1] To the extent that Mr. Wolf suggests that The Original Canopy Tour-USA, L.L.C, as a subsidiary or otherwise related entity, would establish general jurisdiction, he has made no argument as to how this connection is "'so substantial' as to make it one of the 'exceptional' cases in which a foreign corporation is 'at home' in a forum other than its place of incorporation or principal place of business." *Carmouche*, 789 F.3d at 1204 (quoting *Daimler*, 134 S. Ct. at 761 n.19). Nor has he specified what jurisdictional discovery he seeks with regard to this entity or how it might support such a finding.

"[S]pecific personal jurisdiction authorizes jurisdiction over causes of action arising from or related to the defendant's actions within Florida and concerns a nonresident defendant's contacts with Florida only as those contacts related to the plaintiff's cause of action." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1352 (11th Cir. 2013). *See also Am. Overseas Marine Corp. v. Patterson*, 632 So. 2d 1124, 1127 (Fla. 1st DCA 1994) (specific jurisdiction "is often referred to as 'connexity jurisdiction'"). The Florida long-arm statute provides, in relevant part, that a defendant "submits himself or herself . . . to the jurisdiction of the courts of this state for any cause of action arising from" the defendant's acts of "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state." Fla. Stat. § 48.193(1)(a).

Mr. Wolf does not allege that OCT committed a tortious act in Florida and cannot assert specific jurisdiction based on any tort claims related to the incident that occurred in Costa Rica. *See id.* at § 48.193(1)(b). He instead argues that specific jurisdiction is established through language in the Tour Operator Agreement executed in Miami, Florida, between OCT and Celebrity, of which he and other passengers are purportedly direct third-party beneficiaries. As discussed below, however, Mr. Wolf's claim for breach of contract based on a third-party beneficiary theory fails because the language of the Agreement expressly belies

11

any intent to benefit a third party. Because the alleged tortious activity occurred outside of Florida, and there is no connexity between the Agreement and Mr. Wolf's cause of action, the district court did not err in determining it lacked specific personal jurisdiction over OCT.

## C

Where "a defendant is not subject to the jurisdiction of the courts of general jurisdiction of any one state," Rule 4(k)(2) "permits a court to aggregate a foreign defendant's nationwide contacts to allow for service of process provided that two conditions are met: (1) plaintiff's claims must 'arise under federal law;' and, (2) the exercise of jurisdiction must be 'consistent with the Constitution and laws of the United States.'" *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000) (quoting Fed. R. Civ. P. 4(k)(2)).

Mr. Wolf has not addressed the due process prong of this analysis in his briefing, nor has he specifically alleged any contacts with the United States beyond those asserted under Florida's long-arm statute. *See* Compl., D.E. 1, at ¶¶ 11–12 (conclusorily alleging that OCT carried out business in "the State of Florida and/or United States as a whole" and entered into contracts in Miami with Celebrity and "other carriers as well as other entities within Florida and the United States"). Accordingly, our analysis is the same as above with respect to general jurisdiction. Mr. Wolf, without more, has not established jurisdiction under Rule 4(k)(2).

## III

Mr. Wolf also appeals the district court's grant of summary judgment on his negligence claims against Celebrity for failure to warn of a dangerous condition and negligent hiring and retention of OCT. We discuss each claim in turn.

## A

Mr. Wolf first contends that Celebrity owed him a duty to exercise reasonable care to warn him of any dangerous conditions which may have existed with respect to the shore excursion. We hold that, on this record, Celebrity had no notice of a dangerous condition and, absent notice, held no such duty.

"In analyzing a maritime tort case, we rely on general principles of negligence law." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (internal quotation marks and citation omitted). To establish negligence, a plaintiff must show that "(1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm." *Id.*

The existence of a duty is a question of law. *See Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1339 (11th Cir. 2012). A shipowner generally owes to its passengers a duty to exercise "reasonable care under the circumstances." *See Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1233 (11th Cir. 2014).

13

This includes "a duty to warn of known dangers beyond the point of debarkation in places where passengers are invited or reasonably expected to visit." *Chaparro*, 693 F.3d at 1336 (citing *Carlisle v. Ulysses Line Ltd., S.A.*, 475 So. 2d 248, 251 (Fla. 3d DCA 1985)). But the duty to warn "encompasses only dangers of which the carrier knows, or reasonably should have known." *Carlisle*, 475 So. 2d at 251. Accordingly, as a prerequisite to imposing liability, a carrier must have had "actual or constructive notice of the risk-creating condition." *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989).

On this record, we cannot conclude that Celebrity had actual or constructive notice of any dangerous condition. We do not mean to suggest that a cruise line may shirk its responsibility of reasonable care to its passengers, but here the record demonstrates that Celebrity conducted its due diligence at the front end and had no reason to question the continued safety of OCT's zip-line operation. As further discussed below, there is undisputed evidence that OCT is generally regarded as a market leader in canopy tours, and Celebrity selected it for this reason. The record reveals no evidence of any subsequent incidents or problems over the years prior to the incident that would have placed Celebrity on notice of any dangerous conditions that may have existed and may have required some action on its part.[2]

---

[2] We note that, one week prior to Mr. Wolf's injury, a Celebrity employee, Elizabeth Acevedo, participated in, and conducted an evaluation of, OCT's zip-lining excursion. Celebrity maintains that her report contained no allegations or concerns regarding dangerous conditions on the

We are surprised that, over a decade's span, Celebrity received no incident reports—even those occurring through no negligence at all—or passenger safety concerns from OCT for an activity that involves participants of all ages, sizes, and fitness and experience levels whizzing through the air on high speed traverses. Skepticism, however, is not a substitute for evidence. This record does not contain any affirmative evidence of safety concerns or reports of injuries caused by safety concerns. To impose a duty under the circumstances would be akin to imposing vicarious strict liability upon Celebrity.

Mr. Wolf also argues that Celebrity had a duty to conduct regular safety inspections of OCT's operation and therefore should have known of any dangerous conditions in its facilities or services. He relies upon the report of his expert, Mr. Timothy Kempfe, which states that standards developed by the Association for Challenge Course Technology—of which Mr. Kempfe is a founding member and current board trustee—require annual inspections by a qualified professional inspector. *See* D.E. 90-2 at 19–25. Mr. Wolf maintains that Mr. Kempfe provided "significant details" concerning industry standards developed by the ACCT, and that, by failing to conduct such inspections, Celebrity fell below these standards.

excursion. Mr. Wolf suggests that Ms. Acevedo's form merely addressed hospitality—not safety—issues, and that she was not a qualified safety inspector. Mr. Wolf, however, did not depose Ms. Acevedo to inquire into the specifics of her evaluation. His mere speculation is not sufficient to raise a genuine issue of material fact, and, as discussed, he has not established that, absent notice, Celebrity was required to conduct safety inspections.

15

We have held that "evidence of custom within a particular industry, group, or organization is admissible as bearing on the standard of care in determining negligence" and that "[c]ompliance or noncompliance with such custom, though not conclusive on the issue of negligence, is one of the factors the trier of fact may consider in applying the standard of care." *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1282 (11th Cir. 2015) (citation omitted). Mr. Wolf, however, has failed to present sufficient evidence that the ACCT regulations reflect industry custom or standards.

Mr. Kempfe described the ACCT as "an international organization that serves the zip line challenge course community, writing standards and offering professional workshops throughout the world." Kempfe Dep., D.E. 90-2 at 36. Mr. Kempfe also testified that the ACCT is not a governmental organization, and that there is no statute or act that requires companies to follow regulations issued by the ACCT. *See id*. When asked if the ACCT's regulations are legally binding on a company like OCT, he responded that "if we're talking about the standard of care in the industry, they do have obligations." *Id.* Beyond these broad statements, Mr. Kempfe offered in his report that "[a]t least one other cruise line mandates an external professional inspection by an ACCT approved Professional Vendor Member." *Id.* at 25. But he does not provide further details, such as the timing or frequency of such an inspection, or if the inspection is conducted pursuant to the

16

ACCT's regulations. These conclusory statements fail to demonstrate industry standards against which a trier of fact could consider in determining whether Celebrity breached a duty to its passengers by not conducting annual inspections, or inspections by an outside professional. Use of the ACCT standard by one cruise line does not demonstrate an industry custom. *Cf. Muncie Aviation Corp. v. Party Doll Fleet, Inc.*, 519 F.2d 1178, 1180–81 (5th Cir. 1975) (affirming the introduction of F.A.A. circulars as evidence of practices customarily followed by pilots because "[b]oth the defendant's and plaintiff's pilots testified to their general familiarity with the F.A.A. advisory materials, and other witnesses testified that the landing procedures recommended in the circulars were generally followed"). Thus, on this record, the district court correctly granted summary judgment as to Mr. Wolf's failure to warn claim.[3]

## B

Mr. Wolf's contention that Celebrity was negligent in its hiring and retention of OCT as a shore excursion operator similarly fails. Under Florida law, "an employer is subject to liability for physical harm to third persons caused by [its]

---

[3] Mr. Wolf also contends that *Smolnikar v. Royal Caribbean Cruises, Ltd.*, 787 F. Supp. 2d 1308 (S.D. Fla. 2001), provides "a base-line persuasive opinion that other cruise lines are employing an industry standard for this type of high risk activity[.]" Br. for Appellant at 53. That the case broadly discusses Royal Caribbean's evidence that an offshore excursion tour was regularly inspected by outside professionals is not dispositive here. *See Smolnikar*, 787 F. Supp. 2d at 1314. Mr. Wolf has not submitted any record evidence related to those inspections, and *Smolnikar* did not hold that a cruise line has an affirmative duty to inspect a tour operation absent any indication of a problem. *See id.* at 1323–24.

17

failure to exercise reasonable care to employ a competent and careful contractor (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or (b) to perform any duty which the employer owes to third persons." *Davies v. Commercial Metals Co.*, 46 So. 3d 71, 73 (Fla. 5th DCA 2010) (citation omitted). A plaintiff must generally establish "(1) the contractor was incompetent or unfit to perform the work; (2) the employer knew or reasonably should have known of the particular incompetence or unfitness; and (3) the incompetence or unfitness was a proximate cause of the plaintiff's injury." *Id.* at 74 (citation omitted).

Celebrity presented evidence regarding its selection process and reasons for selecting OCT. Specifically, Celebrity's corporate representative, Amanda Campos, testified that in selecting tour operators, Celebrity accepts bids from different tour companies and selects the company by visiting the facility and analyzing different factors, such as safety ratings and price. *See* Campos Dep., D.E. 65-6, at 13–14. She further explained the multiple reasons Celebrity selected OCT, including that OCT had "basically wr[itten] the book on zip lining" because they were the first to do it, they had been operating for three years beforehand, and they generally have a reputation of being safe. *Id.* at 15–16. She also detailed that Celebrity has been using OCT since 2001, that Celebrity has had no serious safety

18

concerns with OCT, and that representatives from either Celebrity or Royal Caribbean have made visits to the excursion. *Id.*

The record is devoid of evidence demonstrating that OCT was incompetent or unfit to perform the shore excursion—much less that Celebrity knew or should have known of any deficiencies. Mr. Wolf again relies upon Mr. Kempfe's testimony regarding the ACCT standards, as well as *Smolnikar*, to argue that Celebrity did not adequately conduct inspections. Again, however, these sources are insufficient to establish a standard of care against which a jury could measure Celebrity's actions.

Given the evidence regarding Celebrity's hiring process, including Celebrity's reliance on OCT's positive reputation and its own evaluations of the facilities, and the dearth of evidence indicating any prior incidents or safety concerns, we cannot say, on this record, that a reasonable jury could conclude that Celebrity was negligent in its hiring or continued retention of OCT as an excursion operator. As a result, the district court correctly granted summary judgment in favor of Celebrity on this claim.

## IV

Mr. Wolf contends that Celebrity is liable for OCT's alleged negligence based on theories of actual and apparent agency and joint venture, as well as for

breach of a third-party beneficiary contract. The district court correctly granted summary judgment in Celebrity's favor on those claims.

## A

"Federal maritime law embraces the principles of agency." *Archer v. Trans/Am. Servs., Ltd.*, 834 F.2d 1570, 1573 (11th Cir. 1998). An agency relationship requires "(1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent." *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1236 (11th Cir. 2014) (citation omitted). Mr. Wolf has not set forth sufficient evidence to create a triable issue on the existence of an actual agency relationship between OCT and Celebrity.

The central question here is whether Celebrity exercised a degree of control over OCT sufficient to create an agency relationship. To determine whether the principal exercised control over the agent, we consider several probative factors, including:

> (1) direct evidence of the principal's right to or actual exercise of control; (2) the method of payment for an agent's services, whether by time or by the job; (3) whether or not the equipment necessary to perform the work is furnished by the principal; and (4) whether the principal had the right to fire the agent.

*Id.* at 1236–37 (citation omitted).

20

Although generally "the existence of an agency relationship is a question of fact under general maritime law[,]" *id.* at 1235–36, Mr. Wolf has provided little direct or circumstantial evidence of Celebrity's right to exercise control over OCT. Indeed, the Tour Operator Agreement expressly provided that "the control and responsibility of the Shore Excursion remains exclusively with [OCT]," and there is no evidence that Celebrity had the right to or did participate in OCT's day-to-day operations. Further, although Celebrity billed the passengers, it appears that it paid OCT "by the job," rather than "by time" (which "normally suggests an agency relationship"). *Id.* at 1237. Additionally, there is no evidence that Celebrity furnished OCT with equipment necessary to perform its work.

Celebrity did retain the right to terminate its agreement with OCT "for convenience." On balance, however, the evidence does not allow a reasonable jury to conclude that Celebrity exercised a degree of control over OCT so as to create an agency relationship. *See Johnson v. Unique Vacations, Inc.*, 498 F. App'x 892, 895 (11th Cir. 2012) (determining there was insufficient evidence to demonstrate agency relationship between resort and excursion company because the resort did not dictate how the excursion owner was to operate its tours and the excursion owner was wholly responsible for the maintenance of its equipment, the hiring and supervision its employees, and the procurement of its own licensing and

21

insurance). Accordingly, the district court correctly granted summary judgment on that theory.

**B**

Mr. Wolf's theory of apparent agency also fails. Admiralty law allows "plaintiffs to sue shipowners based on the apparent authority of third-parties" in cases involving maritime torts. *Franza*, 772 F.2d at 1250–51. "Unlike actual agency, the doctrine of apparent agency allows a plaintiff to sue a principal for the misconduct of an independent contractor who only reasonably appeared to be an agent of the principal." *Id.* at 1249. To succeed on a claim of apparent agency, a plaintiff must establish "first, a representation by the principal to the plaintiff, which, second, causes the plaintiff reasonably to believe that the alleged agent is authorized to act for the principal's benefit, and which, third, induces the plaintiff's detrimental, justifiable reliance upon the appearance of agency." *Id.* at 1252.

In support of his contention that Celebrity made representations that suggested an agency relationship, Mr. Wolf cites to evidence that Celebrity promoted, marketed, and advertised the excursion. He also relies on his own testimony, as well as that of Ms. Falor and a fellow passenger, Timothy Gilbert, who say they believed the excursion was endorsed or approved by Celebrity.

Mr. Wolf's purported belief that OCT was an agent of Celebrity, however, is not reasonable in light of the two separate disclaimers he received—the Cruise

Ticket Contract and the Shore Excursion Ticket—which expressly stated that excursion operators were independent contractors and not agents or representatives of Celebrity, as well as the OCT Liability Waiver, which reiterated that the zip-line excursion was owned and operated by OCT. *See* D.E. 65-1 at 2; D.E. 65-4; D.E. 65-5. *Cf. Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 860 (7th Cir. 2001) (concluding that vendor's apparent agency claim failed because, although company permitted an individual to work with vendors by providing logistical information, that relationship could not reasonably be interpreted as including authority to contract on company's behalf given company's repeated disclaimers regarding the need for a purchase order). Accordingly, there is no dispute of material fact as to whether there was an apparent agency relationship between Celebrity and OCT and the district court correctly granted summary judgment as to that issue.

## C

Nor has Mr. Wolf established that that Celebrity is liable for OCT's alleged negligence under a theory of joint venture. In a contract creating a joint venture, there must be "(1) a community of interest in the performance of the common purpose[;] (2) joint control or right of control[;] (3) a joint proprietary interest in the subject matter[;] (4) a right to share in the profits[;] and (5) a duty to share in any losses which may be sustained." *Browning v. Peyton*, 918 F.2d 1516, 1520 (11th Cir. 1990) (citation omitted).

23

The Tour Operator Agreement does not create a joint right of control because it vested control exclusively in OCT. Further, Mr. Wolf has not provided any evidence that Celebrity and OCT had a joint proprietary interest in the shore excursions, or that they shared in the profits, or that they had a duty to share in any losses. Accordingly, Mr. Wolf's joint venture theory does not survive summary judgment.

**D**

Finally, Mr. Wolf asserts that the district court erred in granting summary judgment as to his claim that Celebrity is liable for breach of a third-party beneficiary contract because Mr. Wolf was the intended beneficiary of the Tour Operator Agreement between Celebrity and OCT. "[A] third party is an intended beneficiary of a contract between two other parties only if a direct and primary object of the contracting parties was to confer a benefit on the third party." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 982 (11th Cir. 2005). The Tour Operator Agreement does not express an intent to benefit any third party—instead, it expressly states the contrary: "this Agreement shall not be deemed to provide third persons with any remedy, claim, right, or action or other right." D.E. 65-8 at 3. The district court's grant of summary judgment as to Mr. Wolf's claim for breach of a third-party beneficiary contract is therefore affirmed.

24

**V**

For the foregoing reasons, the district court's orders dismissing the claims against OCT for lack of personal jurisdiction and granting summary judgment in favor of Celebrity are affirmed.

**AFFIRMED.**