[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-10259

_____

J.F.,
a minor by and through her Mother,
natural guardian and next friend S.F.,

Plaintiff-Appellant,

*versus*

CARNIVAL CORPORATION,
A Panamanian Corporation
d.b.a. CARNIVAL CRUISE LINES,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:22-cv-21332-JEM

_____

Before ROSENBAUM, NEWSOM, and MARCUS, Circuit Judges.

NEWSOM, Circuit Judge:

J.F. alleges that three fellow passengers sexually assaulted her in a stateroom on a Carnival cruise ship. She contends that Carnival could have foreseen the perpetrators' crime and should have, but failed to, take preventative action. J.F. sued Carnival on a negligence theory, but the district court granted summary judgment against her. J.F. has now appealed the district court's decision to us. We hold, in the particular circumstances of this case, that Carnival neither owed J.F. any relevant duty nor proximately caused her injuries. We accordingly affirm the district court's judgment.

**I**

**A**

What happened to J.F. while aboard the *Carnival Horizon* is nightmarish.[1] J.F., a minor at the time, was on vacation with her parents. During the cruise, she often spent time at "Club O2"—a

_____

[1] Because she lost at summary judgment, we recount these facts in the light most favorable to J.F. *See Brady v. Carnival Corp.*, 33 F.4th 1278, 1280 (11th Cir. 2022).

designated hangout and activity area for 15-to-17-year-old passengers. Initially, the vacation seemed to be going well: J.F. got to know other teenagers on the *Horizon*, and she enjoyed spending evenings in Club O2.

Then things took a terrible turn. One night, after Club O2 closed, J.F. met several other teens—including three boys named Zion, Daniel, and Jesus. Earlier that day, Zion had been caught trying to smuggle alcohol onto the *Horizon* after a port excursion. Ship security confiscated the bottle and told Zion's grandmother that although the incident justified throwing Zion off the cruise, they would let him off with a warning. By evening, Zion was hanging out with J.F. and the rest of the group on the lido deck. Eventually, J.F. and the trio got pizza elsewhere on the ship. When J.F. realized that it was nearly 1:00 a.m., she said she needed to check in with her parents. The boys offered to walk her back, and Zion asked to swing by his room to grab a phone charger first. The group didn't encounter any Carnival security officers along the way. The cruise had 20 total officers, but only seven were working that night shift—three in the ship's nightclub, one on fire watch, and three patrolling the ship's 15 decks. When the group made it to Zion's room, J.F. went into the restroom to get a tissue. After she emerged, Daniel locked the stateroom door, and he, Zion, and Jesus all sexually assaulted her.

The assault seemed to come out of nowhere. The parties agree that J.F. felt safe on the *Horizon* from the time she embarked until she was inside Zion's stateroom. And the parties agree that

neither Daniel, Zion, nor Jesus attempted to inappropriately touch J.F. in any way until Daniel locked the door. J.F. was eventually able to leave the room, and she reported the assault a week or so after the cruise concluded.

**B**

J.F. sued Carnival. As relevant here, she claimed that Carnival had negligently failed to warn her of the danger of and prevent the assault. Following discovery, Carnival moved for summary judgment, arguing that it couldn't have been negligent because the sexual assault wasn't foreseeable. Not so, J.F. insisted: There had been 102 reported incidents of passenger-on-passenger sexual misconduct on Carnival cruises during the previous three years—at least 54 of which had occurred in private staterooms. Accordingly, she said, the assault *was* foreseeable.

The district court agreed with Carnival that the assault wasn't foreseeable and granted it summary judgment on J.F.'s negligence claim.

This is J.F.'s appeal.

**II**

This is a maritime tort case, in which we act "as a federal common law court." *Air & Liquid Sys. Corp. v. DeVries*, 586 U.S. 446, 452 (2019) (citation modified).[2] Accordingly, in assessing J.F.'s

---

[2] We review the district court's grant of summary judgment de novo. *Gogel v. Kia Motors Mfg. of Ga.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc). In doing so, we view the evidence in the light most favorable to J.F., the non-moving

claim, we turn to general principles of the law of negligence. *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012). J.F. must satisfy the negligence tort's four elements by showing (1) that Carnival "had a duty to protect [her] from a particular injury"; (2) that Carnival "breached that duty"; (3) that "the breach actually and proximately caused [her] injury"; and (4) that she "suffered actual harm." *Id.* Here, as is so often the case, the "[d]etermination of negligence" is "a fact-intensive inquiry highly dependent upon the given circumstances." *K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d 1041, 1044 (11th Cir. 2019) (citation modified).

This appeal turns on the first and third elements—duty and causation.[3] We take each in turn.

## A

While at sea, "a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959). To be liable for a particular risk or danger, a carrier must "have had actual or constructive notice of

---

party. *See id.* Summary judgment is proper if Carnival "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

[3] The district court and the parties don't distinguish between duty and causation, instead lumping everything together under the heading of "foreseeability." Here, mindful that duty and causation are separate elements of the tort of negligence, we've attempted to sort the parties' arguments into their proper doctrinal buckets.

the risk-creating condition, at least where . . . the menace is one commonly encountered on land and not clearly linked to nautical adventure"—*i.e.*, we ask whether the carrier knew, or should have known, about the danger. *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989); *see also Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720 (11th Cir. 2019). Sexual assault is (regrettably) encountered on land, and so the question here is whether Carnival knew or should have known about the "menace" to J.F.

J.F. advances three theories of why Carnival had the requisite notice. First, she points to cases in which we have said that a series of "substantially similar incidents" under "substantially similar" conditions may establish constructive notice. *Guevara*, 920 F.3d at 720 (citation modified). Second, she relies on the principle that evidence that a carrier has taken corrective action may establish notice. *See Carroll v. Carnival Corp.*, 955 F.3d 1260, 1265 (11th Cir. 2020). And third, she suggests that Zion's alcohol-smuggling incident provided notice of the later sexual assault. Respectfully, none of J.F.'s theories persuades us.

**1**

J.F. first argues that, as a general matter, Carnival was on notice that sexual assaults occur on its vessels with some regularity. She emphasizes two particular data points: (1) that, in the three years preceding her assault, there were 102 reported passenger-on-passenger sexual-misconduct incidents on Carnival's ships, of which 54 occurred in cabins; and (2) that Carnival's former Vice-President of Security had for years asked company management

for more security officers but had been rebuffed due to money constraints and "other priorities." Br. of Appellant at 20, 24 (quoting Froio Dep. 53:24, Dkt. No. 87-10).

For support, J.F. cites two other cruise cases. The first is *K.T.* There, a minor alleged that "a group of nearly a dozen adult male passengers bought multiple alcoholic beverages for her in a public lounge and other public areas of the ship," eventually "pl[ying] her with enough alcohol that she became 'highly intoxicated,' 'obviously drunk, disoriented, and unstable,' and 'obviously incapacitated,'" before finally "steer[ing] her 'to a cabin where they brutally assaulted and gang raped her.'" *K.T.*, 931 F.3d at 1043. Notably, everything before the rape occurred "in the view of multiple Royal Caribbean crewmembers, including those responsible for monitoring the ship's security cameras"—none of whom did anything to intervene. *Id.*

We held that K.T.'s negligence claim survived a motion to dismiss. *Id.* at 1046–47. Accepting K.T.'s allegations as true, we concluded that "sexual assault on minors in particular was foreseeable"—and that Royal Caribbean had a "duty to monitor and regulate the behavior of its passengers." *Id.* at 1044–45. More specifically, given that K.T. was a minor, we held that Royal Caribbean's crew had a "duty" to "refuse to sell alcoholic beverages to any adult male passengers they knew were purchasing multiple alcoholic beverages for K.T." *Id.* at 1045 (citation modified). This was so for a couple of reasons. First, Royal Caribbean had general knowledge of "assaults and batteries and sexual crimes, and other violence

between passengers," as well as previous cases in which "minors wrongfully [were] provided with or allowed to gain access to alcohol, and then bec[ame] the victim of assaults and batteries and sexual crimes." *Id.* at 1044.  And second, in the particular circumstances there, the risk to K.T. was open and obvious:  The ship's crew "saw a group of nearly a dozen men steering a[n] . . . obviously incapacitated girl to a private cabin." *Id.* at 1045 (citation modified).

J.F. also cites *Chaparro*.  The plaintiffs in that case alleged that a Carnival employee had encouraged them "to visit Coki Beach" when the ship stopped at St. Thomas in the U.S. Virgin Islands. *Chaparro*, 693 F.3d at 1335.  On their way back from the beach, the plaintiffs and their daughter "rode an open-air bus past a funeral service of a gang member who recently died in a gang-related shooting near Coki Beach." *Id.*  While the bus was sitting in traffic, gang violence broke out, "shots were fired, and [the daughter] was killed by gunfire." *Id.*  We held that the plaintiffs' negligence claim survived a motion to dismiss. *Id.* at 1338.  The plaintiffs had alleged, in relevant part, "that Carnival was aware of gang-related violence and crime, including public shootings, in St. Thomas generally and near Coki Beach specifically." *Id.* at 1336.  On these allegations, at the pleadings stage, Carnival knew or should have known that the plaintiffs' daughter was at risk of being shot. *See id.* at 1336–37.

On J.F.'s view, *K.T.* and *Chaparro* together establish a rule that "statistics or reports"—like the figures she marshals about

sexual assaults on Carnival's vessels—can establish the constructive notice necessary to support a negligence-based duty.  There's something to her contention.  In *K.T.*, we observed that according to the complaint there, Royal Caribbean had previously "experienced" intoxicated minor passengers becoming the victims of sexual crimes.  *See* 931 F.3d at 1044.  And writing separately, then-Chief Judge Carnes added, more specifically, that "publicly available data"—including "at least 20 complaints of sexual assaults"—"reinforce[d] the allegations in the complaint that Royal Caribbean knew or should have known about the danger of sexual assault aboard its cruise ships."  *Id.* at 1047–49 (Carnes, C.J., concurring).  In a similar vein, the panel in *Chaparro* noted that "Carnival was aware of gang-related violence and crime in St. Thomas generally and near Coki Beach specifically" and that "Carnival monitors crime in its ports of call."  693 F.3d at 1336–37.

While J.F. is right that "evidence of substantially similar incidents" can demonstrate constructive notice, *Guevara*, 920 F.3d at 720, we've also emphasized that "a cruise line's duty is to protect its passengers from a *particular* injury," *Fuentes v. Classica Cruise Operator Ltd.*, 32 F.4th 1311, 1318 (11th Cir. 2022) (citation modified).  The basis for that particularity requirement is that a "carrier by sea" is "not liable to passengers as an insurer, but only for its negligence."  *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1334 (11th Cir. 1984).

*Fuentes* is illustrative.  The plaintiff there had gotten into a verbal spat with another passenger while waiting to disembark the

ship. *Fuentes*, 32 F.4th at 1316. A cruise security officer tried to separate the two, but the passenger sucker-punched and tackled the plaintiff. *Id.* We affirmed the district court's grant of summary judgment to the cruise line, Classica. *Id.* at 1316, 1324. The plaintiff had argued that "Classica had a duty to warn about or prevent" the dust-up "because it kn[ew] that verbal disputes between passengers—no matter the circumstances in which they occur—c[ould] lead to physical altercations." *Id.* at 1318. We concluded, though, that the plaintiff's argument was pitched "at too high a level of generality." *Id.* After all, we explained, "[c]ruise ships carry hundreds (and sometimes thousands) of passengers on each voyage, and those persons physically congregate and interact with each other in countless numbers of ways during the trip." *Id.* Accordingly, we held, the notice "determination must have some connection to the events that gave rise to the negligence claim." *Id.*

*K.T.* and *Chaparro* are of a piece with *Fuentes*. As we explained in *Fuentes*, we focused in *K.T.* "on incidents involving the same type of harm suffered by the plaintiff." And there, of course, the plaintiff, a minor, suffered sexual assaults after the cruise line (indirectly) served her copious amounts of alcohol. *Fuentes*, 32 F.4th at 1318 (citing *K.T.*, 931 F.3d at 1044). So too, in *Chaparro*, we focused on Coki Beach's particular reputation for gang violence. *Id.* at 1318–19 (citing *Chaparro*, 693 F.3d at 1337). Meanwhile, in *Fuentes* the plaintiff's asserted risk of "physical altercations" wasn't granular enough, especially because there wasn't "a single documented violent altercation between passengers during disembarkation" on any of the cruise line's ships. *Id.* at 1318–19.

Our decision in *Brady v. Carnival Corp.* is also clarifying. 33 F.4th 1278 (11th Cir. 2022). In that slip-and-fall case, we steered a middle course between too-narrow and too-broad conceptions of the "relevant 'risk-creating condition.'" *Id.* at 1281. On the one hand, we rejected the cruise line's contention that the plaintiff there had to prove it knew about "the presence of the particular 'puddle on which [Brady] slipped.'" *Id.* On the other, it wouldn't suffice for the plaintiff to allege that the cruise line was aware about wet surfaces writ large. Rather, we held, the question was "whether Carnival knew, more generally, that the area of the deck where Brady fell had a reasonable tendency to become slippery . . . due to wetness from the pool." *Id.* In other words, the notice issue turned "on (1) whether Carnival had notice that the area where Brady fell had a reasonable tendency to become wet, and (2) whether it had actual or constructive knowledge that the pool deck where Brady fell could be slippery (and therefore dangerous) when wet." *Id.* at 1282 (citation modified).

In the end, J.F.'s case is much more similar to *Fuentes* than *K.T.* or *Chaparro*. Both *K.T.* and *Chaparro* included specific facts that put the cruise line on notice of a particular risk: in *K.T.*, Royal Caribbean's previous experience with alcohol-linked assaults on minors and the extensive drinking in direct view of employees, *see* 931 F.3d at 1044–45; and in *Chaparro*, Carnival's knowledge of the risk of gang violence in and around Coki Beach, *see* 693 F.3d at 1336–37. By contrast, the data to which J.F. points don't convey the same level of (or really any) detail. Based on statistics, she asserts that sexual assaults have occurred in the past, sometimes in state rooms,

and she says that one Carnival official thought the company should spend more on security. But this is quite similar to the argument we rejected in *Fuentes*—there, that cruise lines should know that "verbal disputes between passengers—no matter the circumstances in which they occur—can lead to physical altercations." 32 F.4th at 1318. J.F.'s argument lacks a "connection to the events that gave rise to [her] negligence claim." *Id.* Neither her data about previous reports nor the testimony of Carnival's security vice president signal any particular risk linked to J.F.'s circumstances. By analogy to *Brady*, J.F.'s argument is akin to saying that Carnival is on notice of every puddle everywhere on every one of its ships—a theory we repudiated there. *See* 33 F.4th at 1281–82. We have insisted that cruise lines aren't the insurers of their passengers. *Kornberg*, 741 F.2d at 1334. Because J.F.'s broad-ranging duty theory would run afoul of this principle, we must reject it.[4]

**2**

J.F. next invokes our cases about notice and corrective action. She notes that, in the past few years, Carnival—working with consultants—has developed policies aimed at preventing passenger-on-passenger sexual violence and screening would-be passengers for known sexual predators. And it's true: Corrective action

---

[4] That's not to say, of course, that statistics alone could *never* establish constructive notice: If, for example, data established a materially higher percentage of passengers aboard cruise ships were victims of assaults than typical of daily life on land, that might be a different story. So too, it might be a different story if the facts of the reported 102 sexual assaults resembled more closely the facts of the one here. But those scenarios aren't this case.

can signal that a cruise line is on notice. *See, e.g., Guevara*, 920 F.3d at 722 (holding that "a cruise ship operator has notice of a condition—and thus a duty to warn—if a sign is posted on a ship warning about the condition"); *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1289 (11th Cir. 2015) (concluding, in a slip-and-fall case, that testimony showing "that warning signs were sometimes posted on the pool deck after rain" was "enough to withstand summary judgment as to notice"); *Carroll*, 955 F.3d at 1265 (holding that a negligence claim survived summary judgment because "there [wa]s evidence reflecting that Carnival took corrective measures to prevent people from tripping over the lounge chairs").

But in our corrective-action cases, we've been similarly attentive to defining the purported risk at the right level of specificity. *Carroll*, for example, focused on Carnival's awareness that chairs on a particular section of the ship tended to get in passengers' way. In that case we noted both (1) that a Carnival supervisor "testified that the lounge chairs on Deck 11 were supposed to be arranged in the upright position, and [that] he was instructed (and trained other employees that he supervised) to make sure that the chairs were not protruding into or blocking the walkway," and (2) that a Carnival security officer "testified that part of her duties included patrolling Deck 11 and moving any lounge chairs that were blocking the walkway." 955 F.3d at 1266. On these facts, we held that Carnival was on notice that its passengers faced a tripping risk on Deck 11. *See id.* at 1265–66. Importantly, though, we didn't suggest that Carnival was on notice that passengers were likely to trip on chairs *anywhere* on the ship. *See id.* at 1263, 1266. Similarly, in *Guevara*

we emphasized that "[n]ot all warning signs will be evidence of no-tice; there must also be a connection between the warning and the danger." 920 F.3d at 721. So, in that case, we held that a "watch your step" warning sign advising passengers to "hold the handrail" was evidence that a cruise line had notice of a tricky step down—though it might not have been notice of *all* kinds of tripping haz-ards. *See id.* at 715, 721–22.

Carnival's sexual assault policy isn't the kind of particular-ized corrective action that constituted evidence of notice in *Carroll* or *Guevara*. True, as J.F. points out, Carnival worked with consult-ants to develop assault-prevention policies, including a sexual-pred-ator screening process. But any risk of which this corrective action might have put Carnival on notice either is defined at too high a level of generality or doesn't match up with the facts here. It would be one thing if a known sexual predator had assaulted J.F.—Carni-val's policies seem to be aimed at mitigating *that* kind of danger. But J.F. doesn't argue that Zion, Daniel, or Jesus were repeat of-fenders. Because there isn't a sufficient "connection between the [corrective action] and the danger," *Guevara*, 920 F.3d at 721, Car-nival's assault-prevention procedures don't show that the cruise line had notice of the risk to J.F.

**3**

Lastly, J.F. points to Zion's failed attempt to smuggle alco-hol onto the ship. According to her, sneaking booze aboard vio-lates Carnival policy—and in keeping with this policy, Carnival se-curity should have removed Zion from the *Horizon*. At the very

least, she insists, Carnival should have quarantined Zion or imposed a curfew on him. We take J.F.'s point to be that the alcohol-smuggling incident put Carnival on notice that having Zion on the ship was risky.

We aren't persuaded. One failed attempt to smuggle alcohol on board isn't a sign that a passenger is poised to commit sexual assault. A "single incident" can't "constitute constructive notice" of a risk when the incident is completely "different in kind" from the risk. *Fuentes*, 32 F.4th at 1320. Zion's alcohol smuggling has no meaningful connection to the subsequent assault on J.F.: Carnival couldn't possibly have predicted on the basis of a single non-violent breach of one of its policies that a gang rape was in the offing. Accordingly, we hold that the smuggling doesn't count as constructive notice.

★ ★ ★

Even reading the facts in the light most favorable to J.F., Carnival did not have actual or constructive notice of the risk that Zion, Daniel, or Jesus would commit sexual assault. None of the evidence J.F. has presented shows that Carnival knew or should have known about the *particular type* of risk faced by J.F. And because Carnival wasn't on notice, it had no relevant duty.

**B**

Separately, a negligence plaintiff must also prove both actual and proximate cause. *Carroll*, 955 F.3d at 1264. In this case, causation boils down to foreseeability. That's because "[i]n admiralty the touchstone of proximate cause is foreseeability." 1 Thomas J.

Schoenbaum, *Admiralty and Maritime Law* § 5:5 (6th ed. 2018 & Supp. Nov. 2024). And "independent illegal acts of third persons are [generally] deemed unforeseeable and therefore the sole proximate cause of the injury, which excludes the negligence of another as a cause of injury." *Decker v. Gibson Prods. Co. of Albany*, 679 F.2d 212, 215 (11th Cir. 1982). In keeping with this rule, when "the proximate cause of [a cruise passenger's] injury was an intervening criminal act by a fellow passenger, Carnival [can't] be liable in negligence unless the injury by its nature could have been reasonably anticipated or naturally expected to occur or reasonably foreseen in time for it to have prevented the injury." *Fuentes*, 32 F.4th at 1317–18 (citation modified).

J.F. advances one argument that fits most naturally under the causation heading. She suggests that, had Carnival invested in a larger security force, a "hypothetical security officer" would have encountered J.F. and her companions in the ship hallways and somehow prevented the assault. The theory seems to go like this: (1) Carnival could have employed more security personnel; (2) Carnival could have assigned those additional personnel to night shifts; (3) one of those security officers, while on night shift, could have seen J.F., Zion, Daniel, and Jesus walking the ship's hallways; (4) "the hypothetical security officer" could have spoken "to the group [in an] attempt to ascertain their destination and intentions"; (5) this interaction could have "serve[d] to remind all members of the group that security was present"; and finally, (6) this reminder could have "deter[red] any unlawful activity inside the cabin." Br. of Appellant at 25–26. Alternatively, the "hypothetical security

officer" might have "escort[ed] [the] teens back to their families." *Id.* at 26.

We can't accept J.F.'s argument, which heaps speculation on top of speculation. As Judge Friendly wrote in one admiralty-based negligence case, "[s]omewhere a point will be reached when courts will agree that the link has become too tenuous—that what is claimed to be consequence is only fortuity." *In re Kinsman Transit Co.*, 338 F.2d 708, 725 (2d Cir. 1964); *accord* 1 Schoenbaum, *supra*, § 5:5 (explaining that an action can't be the proximate cause of an injury "if the causal chain of events is too tenuous"). J.F.'s hypothetical security officer is too tenuous by far. J.F. hasn't presented sufficient evidence for a reasonable jury to find that the assault was a consequence of Carnival's failure to employ more enforcement personnel. J.F.'s causation theory is particularly strained at Step (4) given that, even on her account, nothing suspicious occurred in the open—things only went horribly sideways once the group was in private, behind a locked door. We therefore hold that the assault wasn't a foreseeable result of Carnival's staffing levels.

★  ★  ★

The sexual assault on J.F., as she describes it, was both tragic and depraved. But the question here is whether Carnival is responsible. We hold that it is not. Carnival—which oversees a vast fleet of ships, each the site of countless human interactions—couldn't have known about or foreseen the attack. Accordingly, it can't be liable.

### III

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to Carnival.